At October Term, 1795, the Court gave their opinion as follows:
Judge Haywood:-
Before we proceed to the immediate investigation of the first question-whether, in the case of a sealed instrument, unattested by any subscribing witness, the handwriting of the party may be admitted in evidence? it may be proper to take a view of the origin of deeds, in our law ; and of the various changes and alterations, the law has undergone, with respect to that species of instruments, in order to be accommodated to the different circumstances, which different periods of time have produced. This may have a stronger tendency to place the present question in a true light, than perhaps any other method of treating the subject that could be devised.
Let us consider, therefore, 1st. the origin of reducing contracts to writing ;-2dly. the origin of sealing, with the uses that have been made of it, at different periods ;-3dly. the origin of delivery.
We will then consider the only circumstances essential to the constitution of a deed at this day : and, lastly, from all these premisses we will draw conclusions applicable to the point now in controversy.
I. All writers agree, that the northern nations Of Europe, who spread themselves over the southern and western parts of it, were an illiterate people, who despised all arts but those of war. The Saxons who founded the heptarchy in England, and afterwards the English monarchy were part of those people—they had, in general, no knowledge of letters-their laws and customs, their legal ceremonies were preserved and transmitted to others and to posterity by tradition only. To keep up a military spirit, and to have a band of warriors always ready at command, it was the universal practice of the conquering leaders of these nations to divide the conquered country into allotments, which were parcelled out to their followers :- first, at the will of the lord or leader; next, for the better encouragement of agriculture, for life ; and, last of all, for ever or in fee. About the time, when it began to be usual to make these grants for life, the christian religion, under the auspices of the papal fee, was propagated in England by St. Augustine and others, and was soon adopted and received as the national religion. Its priests were men of some learning—they here, as in all other places where they have been received, began to grasp at temporal advantages—they inculcated upon the minds of the people, that it was an act of the most meritorious piety to provide for the maintenance of the ministers of god. This doctrine had its effect, and donations of allotments of land began to be made to the church, also for life: but this life was supposed to be perpetual, as the church never died. The donations of these allotments, for want of a better method of perpetuating the transaction among the laity, who knew nothing of letters, had always been made by livery of feizin, done in the most solemn form, to impress it on the mind, before a number of the co-vassals or tenants of the lord, who, in case of a dispute, were assembled in the lord’s court, and determined chiefly by the remembrance which these impressions had made between the parties. The presumption was, that if some *3 who were present, from length of time, had forgotten some of the circumstances or conditions annexed to the donation, others of them might remember them, and so, by the united remembrance of all together, might, in the end, ascertain the true state of facts. This, by the way, I suspect was the origin of juries, and of the unanimity required in their decision, Each juror contributed the circumstances lodged in his mind to the general stock of information which formed the verdict; and, by conference with his fellows brought to their recollection the circumstances which he remembered, and the others, or some of them had forgotten, until at length the whole transaction was renovated in the minds of all. This mode of conveyance answered the purpose sufficiently, when donations were for the life of an individual only ; for it would seldom happen that he would survive all the other pares of the lord’s court, who were present at the investiture. But, when donations were made for life to a churchman, for the benefit of his church, and it was a received maxim that the church never, died, this method no longer answered the purpose as to them, for the donation might have continuance, and the conditions, upon which it was made, might come in question, after every one of the parties present at the investiture were no more, and then the allotment might be liable to be resumed by the lord ; all lands included in his territory or manor, not granted to one of his vassals, belonging to him; and, after the death of all the pares, no evidence remained of the investiture, much less of the conditions annexed thereto. It became necessary, therefore, when the church was concerned, to have some other mode of perpetuating the transaction than mere livery of seizin ; and the clergy, being the learned part of the community, devised the mode of reducing the terms of the donation to writing, Sullivan, 82, and when the lord, on account of sickness, the distance of the land from his place of residence, his being employed in some other business, or some other cause, could not go upon the land to make livery, then the writing containing the terms of the donation was solemnly delivered, before the peers of the court also, in lieu of the land, to the end that, being delivered before them in so solemn a form, they might be witnesses of the investiture of the land mentioned therein, and might be able upon trial to ascertain the identity of the paper delivered. This was not indeed a complete investiture of itself, it was termed the improper investiture, and bound the lord to make a more formal livery of seizin of the land contained in the deed at a future day and was a sufficient security to the donee in the interim. Experience evinced the safety and certainty there was in reducing these landed contracts into writing, in the case of churchmen; and the laity, wishing to be as secure as possible in their possessions, adopted by degrees the same method; which afterwards, when these allotments were extended to the heirs of the possessor, became equally necessary for the laity as the clergy, and from that time, deeds of feoffment, to accompany the livery of seizin, became generally used, though the livery of seizin was good without them: and these contracts in writing, being found so advantageous in perpetuating the terms and conditions of a landed donation, were, by degrees, converted to the *4 purpose of perpetuating other contracts, that concerned only persona estate, which, formerly, amongst the unlettered Saxons, were completed by shaking of hands only, 2. Bl. Comm. 448.
II. The preserving the remembrance of a landed contract, having thus become general, in the times of the Saxon government in England, and the general illiterature of the laity of all ranks prevailing universally, it was customary for them to put some mark, usually the sign of the cross, to identify, as well as they could, the writing they had agreed to: and this was done coram paribus, who, upon the trial, might remember it, or be able to distinguish it from some circumstance attending the making the deed or the mark itself. But, upon the Norman conquest, it became the policy of the conqueror and his sons to abolish the Saxon customs and for this purpose to draw as many causes as possible to be determined in the curia regis, where the judges were Normans. Sull. 339, 343, 369, 374, where the pares of the neighbourhood were frequently not called upon to decide between the litigants, as they uniformly were in the court of Saxon institution, the county court, hundred court, &c. About this period, the bishop was separated from the sheriff, in his county court, and it was established as a rule, that the county court had not cognizance of any demand of more than forty shillings value; the consequence of which must have been that all causes were carried in the curia regis, and it must frequently have happened also that the marks affixed to the deeds, for want of the pares, were incapable of any distinction and of course any proof of the identity of the instrument. This produced an inconvenience. The greatest men among the laity could not write their names, so as to give a proof of identity that way, and being under the necessity of providing some more certain criterion of identity, than that of the sign of the cross, they introduced for the first time into England, the practice of impressing their writings with a seal. Sulliv. 374. Terms de ley, verbo Fact. Gil. law of evidence 17, 18, 20, 78, The seal exhibited the emblem which its owner had affixed to his person, when covered in the field with his coat of mail, and which, being pourtrayed upon some conspicuous part of his dress, served to designate his person. These symbols came to be very much in use, at the time of the crusades to the holy land, in the time of Richard I. and after, and were continued by the knights and other persons, who then used them by way of distinction in their families, after their return home. The seal, therefore, of any distinguished person, could immediately be known by inspection only. This method of sealing, however, was not introduced all at once, but by degrees. It was at first only used by such as were entitled to those distinguishing symbols—by the nobility and gentry only. For Lucie, chief justice of Henry II, reprimanded a common man who had made use of a seal, saying that belonged to the nobility only. Terms de ley, ubi supra, and several other books. But it is to be remarked that about this period, and for some time before, the common people had but little use for seals, as they could have but few contracts. The conquest had introduced the maxim of *5 non-alienation without the consent of the lord. A great number of them were villeins, who could not acquire property at all, but for their masters; and as to the feudal tenants, they were continually harrassed by attending their lords in war. Commerce had not yet began to flourish and increase the personal property of the nation; and the old law authors of those times have scarcely a chapter upon personal property. 2. Bl. Comm. 385. And even when the a crime of non alienation began to wear away imperceptibly, the common people, being not entitled to any family distinction, had no seals and were obliged to contract as formerly was used, before the introduction of sealing. The uncertainty of such a method begat, in combination with other circumstances, peculiar to those times, the practice of conveying by fine, where the whole transaction with the precise terms of the conveyance were recorded in one of the king’s courts, and obviated completely any future controversy respecting the execution of a deed. At length, however, the eyes of the nation began to be opened to their true interest: trade flourished ; agriculture was encouraged; personal property increased; lands, or part of them, at least, began to be freely alienated: they were made liable to answer the debts of the merchant, and as to part of them the debts of any other proprietor. Contracts, both for real and personal property, became frequent among all ranks of men. The necessity of authenticating their written contracts became urgent; they of course used the best mode then known. They broke through the privileges of the nobility and gentry, and made seals with such impressions as each man’s fancy suggested to be the properest mark for distinguishing his contracts. By the time of Edward III, seals were in general and common use. Terms de ley, ubi supra. Cunningham, title deeds, who cites Perkins, 229, and sequentia; and it became a rule of law that a deed, could not be constituted, without a seal; and the method of signing with the sign of the cross or some other mark had gone into total disuse. Thus it seems clear, that the seal was originally introduced in the place of signing, as an evidence of the identify of the writing, which contained the party’s agreement, and afforded a full proof thereof by the inspection of its impression only, and signing by the party was held unnecessary and useless. In reality it could contribute but little to the proof of the writing, as long as the illiterateness of the people continued; which was until some time after the introduction of printing into England, in the time of Edward IV. Insomuch that, as late as the time of Henry VII, the being able to read was held to be a legal proof of a man being a clergyman, or clerk in orders, 2. Bl. Comm. 360.
This universal use of seals, however produced its inconvenience, when every man who made a contract was obliged to use a seal to authenticate it. Many of those seals were not known to the jurors, and they could not determine in many instances on the authenticity of the instrument, upon the inspection of the seal only. They were of under a necessity, therefore, to call upon those who were supposed to know the seal which the party used, to say whether that was the impression of his seal or not; and upon this evidence they decided, *6 and some times upon the companion of the seal with impressions upon other instruments, which were proved to be sealed by the party. But still, in contemplation of law, these seals were held to contain an intrinsic evidence in themselves of the contract to which they were affixed, and, therefore, as well as for the purpose of being compared, the rule of law was established that they should be carried out by the jury. Gilb. law of evidence, 20. But with respect to those seals which still retained sufficient distinction in themselves, as the great seal, the seals of the courts of justice, the seals of corporations and some others, no proof as to them was required or perhaps allowed. They still continued to answer the genuine purposes of seals at their first introduction, and were full evidence of themselves. The people began at length to forget the original use of this institution and to seal with any impression they could get, and the law, rather than invalidate the whole transaction left it to the jury to decide whether that was the seal of the party or not. In this country the people have departed still further from the true use of seals, by not making any impression at all, scratching something like a seal, upon the margin of the paper, and making that pass for a seal. To the first of these abuses the law has conformed and will now deem the sealing to be sufficient, if found by the jury to be the seal of the party. For fear of destroying some contracts improperly made, at first, it has relaxed from strict propriety, and the practice of sealing with any impression has become general, and is now, from necessity, allowed to be good in every instance. Cunningham, verbo deeds, cites Perkins, 129—34. Cro. Car. 149. Gil. L. E. 20, but still the contemplation of law is in conformity to the ancient use of seals. They are deemed the signs of authenticity; are supposed to have an intrinsic evidence in themselves, and for that reason are carried out by the jury, Gil. L. E. 17—20. cites Sid. 145, Hard. 118. Plow. Comm. 411: and Sir Edw. Coke, speaking of deeds, page 6, b, says “ also the deed may receive credit per collationem sigillorum, scripturæ, &c.” and Baron Gilbert in his note upon 2 Ba. Ab. 494, says “ the seal appearing, it must be presumed to be put there by the parties to the deed,” cites Leo. 25, Owen 23, Bend. 1. In the reign of Henry VII. and Henry VIII. learning, and the art of writing, had become much more general than in former times, and by this time also seals had become much less a mark of distinction, and proof of the individual contract made by the parties, than in former reigns: but the rule, that the deed must be authenticated by the party’s seal, had passed into settled law. In order, therefore, to give a sure proof of the seal which proved the writing that contained the agreement of the party, subscribing his name, at the foot of the instrument, immediately after its conclusion and prefixed to the seal, in the same place and in the party’s own handwriting, began to be used. Noy. 163. And although it was held in conformity to the rule then established, and which has ever since continued, that such a signature was not necessary so the essence of the deed, yet where the jury could not decide with respect to the deed, upon inspection of the seal merely—nor be satisfied by a witness who knew the impression— *7 nor by a comparison of the seal in dispute with other seals made use of by the same party, they were allowed to form their judgment upon the hand-writing of the party prefixed to the seal; and that was the scripturæ intended by sir Edward Coke, in the passage above cited, where speaking of the doctrine of deeds and of presumption, he says “ also the deed may receive credit, per collationem sigillorum, scripturæ, “&c. et super fidem cartarum: mortuis testibus erit ad patriam, de neces“sitate, currendum.” Co. Litt. 6. b. It may be here supposed he meant the handwriting of the witnesses; but this is not his meaning, for he says expressly, in the very next page, that the clause of biis testibus is not essential to the deed, and in page 6, a, he says “very necessa" rry it is,” by which he means advisable or prudent, “ that witnesses should be underwritten or endorsed for the better strengthening of deeds” (not that it is absolutely necessary to make them valid), “and “ their names, if they can write, written with their own hands,” not that they must necessarily be subscribed with their own hands. Even, at this day, there were many witnesses who could not write their own names, and their names were to be endorsed, and when these witness es, namely, witnesses who had not subscribed their names in their own hand-writing, could not be found or were dead, then the deed was to receive credit per collationem sigillorum et scripturæ, coupled together. This proves the position, that the signature of the party was used as a proof of the seal. If it was not evidence of the seal, then it was in vain to prove the hand-writing at all: for that of itself was totally unessential to the deed, and made no part of its essence, as the same author had said in the page last preceding, and as is held to be the law at this day. Salk. 462, pl. 2. And, that the proof of the signature of the party, when admitted, is used as a proof of the seal, is avowed in terms almost unequivocal, by Baron Gilbert, in his law of evidence, 99, 103, where he says “ for though the deed be produ"ced under hand and seal, and the hand of the party that executes the deed “ be proved, yet this is not full proof of the deed, for the delivery is “ necessary to the essence.” Does not this manifestly imply that the proof of the hand-writing, proves every thing, which is of the essence of the deed, but delivery only: and of course that it proves the seal? With respect to an attested sealed instrument, it is the common practice, in the English courts, where the witnesses are not to be found to prove both the handwriting of the witnesses and of the party. Bl. Rep. 532. Forbes, executor &c. vs. Wale, such proof admitted, before Lord Mansfield, to be given. 2 Brown’s Ch. Rep. 536, 538, the same proof admitted before the Lord Chancellor, and stated, by the counsel opposed to the fact it meant to establish, to be evidence in the common form. The same proof must also have been admitted in the case of Gould and Jones reported in Bl. Rep. 384, as may be seen by having recourse to the case itself; and the same kind of proof was clearly admitted in the case of Coghlan and Williamson, reported in 1 Douglass 93. But, why, in all those cases is the proof of the party’s signature held necessary, is proof of the witnesses hand writing proves both sealing and delivery, and not the delivery only? From the reason of the thing itself, and more especially from *8 the great weight of these combined authorities, it seems to be a conclusion fairly warranted, that at this day, whatever it might have been formerly, the seal is in some instances proved by the signature of the party. This holds in all those instances, where the signature of the party is admitted to be proved: and that the seal always since its first introduction has been used as an evidence of the writing, in which the party has deposited his agreement.
III. With respect to the delivery, I have no more to add to what has been already said, relative to its coming into use instead of the livery of seizin, and being, like that, made in solemn form coram paribus, to the end it might make the deeper impression in their minds, than, that this solemn delivery of the deed coram paribus, being found to be well calculated to make the desired impression in the case of landed contracts, and also, from the same solemnity, to excite in the party a reflection upon the subject he was engaged in, it was continued in other contracts; and, like the seal, was consider ed an essential ingredient to the constitution of the deed. Here it may not be improper to remark upon the excellence of this institution when once established, tho’ introduced gradually and for other purposes, in preventing all manner of surprize upon the party. It was first to be written; this necessarily employed some time; he had the interval for reflection: it was to be read over to him, if he requested it: then the wax was to be prepared and melted; next a seal to be procured; then an impression to be made: thus gradually approaching to the final act, still giving time for reflection, and exciting by each new act still greater apprehensions, and last of all, left the former precautions might not be sufficient to put him upon reflection, he was called to go before the pares of the neighbourhood, and to make a solemn delivery of the instrument, After all these ceremonies were complied with, it was scarcely possible to believe that the party was circumvented by fraud, or surprized into what he had done. After the pares were disused, and the authority of the county, and hundred courts diminished, I apprehend a delivery before the pares went out of use, but that a delivery of the contract was still used as a sign of the party’s assent to the contract contained in the deed, and has, ever since been deemed necessary to give it its final validity.
Such seems to be the origin and progress of the several circumstances of writing, sealing and delivery of deeds, which came into use, not all at once, but at different periods of time, and were used for perpetuating, authenticating and proving the complete and final assent of the party to his contract. Any other concomitant circumstances, besides those, tho’ they have been sometimes used, and said to be incident to deeds, as signing by the party, subscription by witnesses, and many other, as many be seen in Co. Litt. 7, a: yet they have never, at any period of time, been held material to the essence of the deed; unless perhaps in some instances, where such circumstances have been required by statute: and that these are the only necessary circumstances is proved by all law writers both anc *9 ient and modern. Co. Litt. 7. a, says “I have termed the said parts " of the deed formal or orderly parts, for that they be not of the “ essence of a deed of feoffment. For if such a deed be without pre" mises; habendum, tenendum, reddendum, the clause of warranty, the " clause of in cujus rei testimonium, the date and the clause of biis tes" tibus; yet the deed is good : for if a man by deed gives lands to “ another and his heirs, without more saying, this is good, if he “ put his seal, deliver it, and make livery accordingly.” Wood, in his institutes, adds “ where livery of seizin is necessary,” importing as lord Coke clearly did also, that if it were not a deed of feoffment, but a deed of some other kind, then putting the seal and delivering the writing, would make it a good deed. The same definition is given and the same circumstances only mentioned as necessary in 2 Re. 4, 5. 10 Re. 92. 3 Ba. Ab. 393. 2. Ba. Ab. 493, who cites 2 Roll’s Ab. 21. 1 Nels. Ab. 623. Terms de ley verbo Fait, Co. Litt. 171, b. Gil. L. E, 78. Shepperd’s touchstone of common assurances and many others.
After the production of this concurrent testimony of so many authors, it seems scarcely necessary to-say that the subscription of witnesses in their own handwriting to a deed was never held necessary to its constitution. The reasons already assigned for the first introduction of seals and their continuance for a long time afterwards, namely, the illiterature of the laity, proves also that the subscription of witnesses was not used during that long period, which commenced soon after the conquest and continued to the time of Henry VII and Henry VIII. Even the magna charta of king John given at Running mead, in the year 1215, in the former part mentions the archbishops bishops, barons, &c. not particularly naming them, and in the end is attested in this manner, testibus supra dictis et multis aliis, and left any thing should be added or substracted from the form of the writing, he thereto put his seal. Bl. law tracts 35, 36. In 1216, the first charter of Henry III. is attested thus testibus omnibus prenominatis et multis aliis. I infer from this, that in a matter of so much moment they certainly used the best method of attestation then known or used, and as they did not subscribe their names, it is an evidence that the subscription of witnesses in their own hand writing was not then practised. The attestation of private deeds was in the same manner; the names of the witnesses were underwritten or endorsed, and this was used only as a memorandum, to shew who of the pares were present, to the end they might be called upon and associated to the jury, upon the trial of the issue, when the deed was denied. Vide Co. Litt. 6 a & b; and sometimes it was said teste comitatu; hundredo, &c. 2 Bl. Comm. 307. I apprehend the practice of subscribing by the witnesses came into use at the same time, with the subscribing by the party; at a time, when the law respecting deeds was already firmly established, and when bath these circumstances were held unessential, tho’ perhaps both of them at the time might be useful: the signature of the party to prove his seal and that of the witnesses, when they could not be found, to prove the delivery of the deed. For when it was proved, by his own signature to be the seal of the party, there a *10 rose a very strong presumption from the proof of the handwriting the witness, that they, had been present at the delivery. But this kind of proof was only resorted to, when positive testimony could not be procured, and was not in the party’s power to produce. To proceed a little further the statutes of 2 Ed. II. & 9 Ed. III. speaking of the trial upon the issue of non est factum, say, “ the witnesses “ shall be summoned, where there are witnesses named in the " deed; but if they do not appear, at the day appointed, the trial “ shall proceed, notwithstanding their absence.” Hence the conclusion follows, that in those days, there were some deeds without witnesses named in the deed, and as to them there was no delay of trial. Secondly, that there were other deeds, wherein witnesses were named, and that as to them the trial, could not be in their absence, for they were to be summoned and to make part of the jury. Thirdly, this statute directs that they shall be summoned as usual, but in cafe of their non appearance the trial shall nevertheless go on, by the jury that are present. Fourthly, that there was some other method then used of proving a deed, than by the witnesses named in the deed, or else this statute operated injustice by ordering the trial to proceed upon the first default of the witnesses (who perhaps, might be convened at another day) and by so doing rendered the deed invalid and void; and this it is unfair to presume. That it could be proved by other means is held by lord Coke 121. b. where he assigns the reasons why the law requires the prosert of a deed, in pleading to the court, to wit, that it may be proved by witnesses, or other proof, if denied. This opinion is strongly confirmed by some modern decisions, where the rule of law is held to be that a witness shall not be permitted to deny his own attestation. The true meaning of which rule is that if he does deny it, upon the trial, the deed may be proved by others, who were not attesting witnesses, and whose names were neither subscribed nor endorsed. Douglass, 216. 4 Burr. 2225. This proves, beyond all possibility of doubt, that the attestation of witnesses is not necessary; for if the delivery may be proved by persons who did not attest, in case of an attested deed, can there be any solid reason assigned why they may not prove the delivery in case of an unattested deed, where there are no witnesses to deny their attestation, and by that means bring a suspicion on the instrument? Upon this point, I think, it may be affirmed in perfect confonance with the rules of law, that at this day, the attestation of witnesses, either by endorsing or underwriting their names in the hand writing of the drawer of the deed, or by a subscription of their names in their own hand writing is in no wise essential to the validity of the deed: and from all those premises we may also infer some other conclusions.
If writing, sealing and delivery be the only essential parts of a deed, and the law deems it valid without the further ceremony of a subscription by witnesses, then, there must be some other competent means of proving the deed, otherwise than by subscribing witnesses. It would be absurd to attribute validity to an instrument *11 which had these essential parts, and yet say it should not be read, to benefit the party producing it, unless, proved by subscribing or endorsed witnesses. But what other means are competent?
To form a decided opinion upon this head, we must remember, that there is but one general rule in relation to evidence, and that is that the law requires the best evidence. But this rule is always relaxed upon two grounds, either from absolute necessity or a necessity presumed from the common occurrences amongst mankind. The rule is not so stubborn, but that it will bend to the necessities of mankind and to circumstances not under their control. The rule is adopted only to obviate the fraud of mankind. One shall not deceive the jury by offering a less convincing testimony to establish his point, when it appears there is a proof more elucidative of the point in controversy, in his own possession or power, which perhaps, he does not offer because it would be decisive against him. It was never meant to exclude the party from justice, merely because he had not, through ignorance, provided himself originally with the best evidence it was possible for him to provide: for then two witnesses would be better than one; a hundred better than two; and so on progressively. A writing would be better than a parol contract; a deed better than either; and a record better than all, Neither was it intend ed to deprive any one of justice, when, without any default in himself he had lost the better evidence which he had provided originally. It first deprives him of the power of imposing upon us, and then lays itself open to be relaxed, as circumstances shall in justice require. These circumstances, as I began before to mention are of two kinds; those founded on absolute necessity; and those founded on a necessity occasioned by those occurrences which are common amongst mankind. We will touch upon the first class only. In the case of deeds, if there be subscribing witnesses to them (see 1 Atkins 49, the argument of lord Hardwicke, in the celebrated case of Ormichund and Baker, and mark the implication) they must be proved by these witnesses. Because, it is presumed that these witnesses can give a more distinct and satisfactory relation than any others; having been called upon originally for that purpose: but if the witnesses be dead, or not to be found, and that be proved to the court, then the hand writing of the subscribing witness may be proved; that raising a violent presumption in favour of the deed. If the deed be lost, and that appear to the court, then the copy shall be read, as affording a presumption. But, if there be no copy, then an abstract may be admitted, that affording a probable presumption, and if no abstract, parol evidence of the contract may be offered. The true intent of the parties, to be regulated by that contract, shall not be defeated and justice overturned, so long as any evidence remains, Which throws any glimmering of light on the subject from which a jury may be enabled to infer the real state of the transaction. The subscribing witnesses in the case above stated are not required, because the deed cannot be proved without them, as has been already evinced ; but because were they not produced the defendant would be deprived of the cross-examination of those persons he had *12 provided to give testimony for himself, as well as for the other party, and who, if produced, upon such cross-examination, would perhaps give material testimony for him. But, if the subscribing witnesses are not to be had, the law chuses the least of two evils. It is better to dispense with the witnesses and receive other proof which may be sufficient, than adhere to the rule, when they cannot be had and so, at any rate, destroy the deed; thus; if the obligee removes the witness, his acknowledgment that he executed the deed, is proof. H. Bl. Rep. 623. In all cases, therefore, where it is apparent to the court, that there is no positive testimony to be had, there must be a recurrence to testimony founded on presumptions, or circumstantial proof, as it is called. Therein requiring first the best presumptive proof that is to be had, and in default of that, the next best until we have passed thro’ all the several grades of circumstances that raise presumption, from that which lord Coke terms the violent, until we arrive at that which excites the light presumption that moveth not at all. If this be the true theory of evidence, and if an unattested deed, being valid, may some way or other be proved, as it certainly may: then in the first place the party must produce witnesses who were present, at the execution, tho’ not endorsed nor subscribed, as in the case where subscribing witnesses to an attested deed deny it, and if there are no such witnesses, then there must be a recurrence to presumptive testimony. And here, as in the case of an attested deed, when the witnesses were not to be had, proof of party's signature would be admitted, as a proof of his seal: so, in the case of an unattested deed, I can see no reason, why the same species of proof should not be admitted, where no better is to be obtained. There also, lord Coke’s doctrine, so often before cited, of comparison by seals, hand-writing, &c. might be admitted. The law also will, here, chuse the least of two evils; and if sufficient proof of the seal shall be offered, other circumstances shall be admitted, to prove the delivery. This is yet necessary. But a small matter is sufficient to establish it, when once the seal is proved to the satisfaction of the jury, as leaving the deed, behind him after it was sealed and read, held a good delivery, Cro. El. 7. Shippen’s case. So where an obligation was written in a book, and the party put his hand and seal to the leaf in which it was written: adjudged this was sufficient, though there was no evidence of a delivery. Cro. Eliz. 613. Fox vs. Wright, and many other cases to the same effect. If no positive testimony can be given of a delivery, the party must be allowed to prove such circumstances as will induce the jury to find a delivery. In the two cases last cited, it is surely more compatible with justice, and the rule of evidence in similar cases, to admit, than at once to destroy, the deed by rejecting such circumstances which jury might deem sufficient to convince their minds, together with other circumstances, they might themselves be acquainted with. Surely, there are a great variety of circumstances from which a delivery might, very properly, be inferred. Suppose a deed of feoffment produced and the handwriting of the party proved, *13 and also possession according to the deed. Co. Litt. 6, b. Gilb. L. E. 100; suppose part of the principal be paid upon a bond by the defendant, or interest: or suppose the bond should be shewn o him and he requested the party not to bring suit upon it : supp e, the bond sufficiently described in a letter and acknowledged, 2, Nelf, 762, pl. 45. 2, Eq. C. Ab. 413, pl. 9. Suppose upon the back the bond, he enter an endorsement taking notice of it, as his bond. Buller 254. C. K. B. 500; suppose he state it in a bill or answer in chancery, Buller, 236. Suppose he has made a parol confession of it, Douglas, 93, 216; in which last case, the proof evidently would have been deemed sufficient had there been no subscribing witness. Or, by like parity of reason, suppose any other possible circumstance, from which a jury might justly and fairly infer a delivery, surely it ought to be received : even the possession of the a obligee, where the other party could not shew the illegal comm encement of that possesion, might afford a presumption in favour of the deed. But, as there is no case to warrant me in going so far, I will not yet say that that circumstance alone should be left to the jury. But such circumstances, as are before, mentioned and all others of equal weight, I do think should be left to them, to infer a delivery from or not, according to the best of their judgment. Therefore, in the case stated, I am of opinion that the witness was properly admitted to prove the signature of the defendant; and that the jury were at liberty to infer from thence, that the seal affixed was the seal of the party, and as the admissibility of this evidence is the only doubt stated—as the jury have found a verdict in favour of the plaintiff, subject to that doubt only, it must be intended there was some other circumstance given them in evidence sufficiently evincing the delivery: and therefore as to the first objection, stated in this special case, there ought to be judgment for the plaintiff, notwithstanding.
It seemed to be insisted on, at the trial, that the clause of In witness whereof I have hereunto set my hand and seal, might be received as an evidence of the seal; and as some case may hereafter occur, in which that clause may have only the words: In witness whereof I have hereunto set my hand : when, in facts there may be a seal affixed, I will remark upon this clause a little ; more especially, as it is set down in this special case, and the opinion of the court is expected upon it. I would observe then, in the first place, that this clause contains a part of the words of the deed, and the deed itself, or any part of it, cannot be read, until the sealing and delivery of it be first proved; and of consequence this clause cannot be read to prove the seal until after the seal has proved the clause itself. And then as to the purpose of its proving, or disproving the seal, it is totally useless; and, that such a clause is not only unnecessary in itself, but that the words of it have always been disregarded, is proved by such an abundance of authorities, that the bare citation of them will fully establish the position that the omission of this clause or the addition of it, or the words of it, can have no influence whatever upon the writing itself. Some of them are the following: Co. Litt. 7, a, Salk. *14 214. 2 Rep. 5. The deed is good, tho’ this clause be omitted. Nels. 623. pl. 7, who cites Moor 3. It is not a conclusion of the deed: for that which is written after it, is as much part of the deed as that which is written before. Also 2 Nelf. Ab. 621, pl. 13 who cites 3 Bulstrode 300. “In witness whereof I have hereto see my hand”: the deed is good, if there be a seal, tho’ the clause do not mention the seal. Cunningham's Dictionary, verbo Deeds, cites Hetley 75. and by the like reason, if it mention hand and seal, still it can operate nothing 2. Str, 814, 815, Ld. Raym. 1541, for the seal is not established by the words of the writing, but e converso: the words contained in the writing are proved to be the words of the party, by his seal. And, if the words contained in this clause were allowed to prove any thing, the party to be benefited by the deed, would have nothing to do, but, to insert this clause, In witness whereof I have sealed and delivered, and the evidence of the deed would be complete. Suppose in the present clause that the word seal had not been in the clause, and yet the seal should appear, with the word seal within it, in the handwriting of the obligor, as was the fact here : would it not be a harsh determination to say it was not his seal? Yet we know such cases often occur :
It may be objected that, if the words contained in this clause, are not suffered to have any weight, then the holder of a promissory note, might add a seal to the name of the party ; and by that means avoid the act of limitations, and also circumscribe the party in point of evidence. To this, the answer is, that the rules of evidence were established long before the statute of limitations, and that act did not intend to alter them.
2. That the law has guarded against such attempt by making the writing totally void, if it should be attempted, and also subjected the party to very severe punishment, for the attempt.
3. If there are witnesses, they may be produced to say what they know of the seal.
4. If there are no witnesses, the circumstances to prove a delivery, may throw some light upon the seal itself.
5. The law will not presume such turpitude in any man. The possibility of his commiting such an offence will not vitiate the act, as if he had actually committed it; and in this case, as in all others, the injured party should prove the injury done him. Again, if the instrument should be held invalid, because possibly the seal might have been affixed after the execution of it, then more good deeds would be destroyed upon suspicion, than frauds prevented by it. For few men will attempt a fraud of this kind, under the multiplied hazard of receiving infamous corporal punishment, and being for ever degraded from their rank in society, and the total loss of the thing secured by the deed, especially if it be of great value. Experience shews that men, not well knowing the technical distinction between a seal and their signature say witness their hands and put their seals also, and e converso, declare in this clause that they have put their hands and seals, where they have subscribed their names only. Here, as in all other cases, the law chuses the least of two evils. Once more, the subscribing *15 witness to a bond may have subscribed, being about to depart for a foreign country, when in fact the deed may not have been executed, but this possibility will not cause a rejection such testimony nor shall the seal be rejected, because not mentioned in the clause, for such possibility as is in the objection.
But it may happen in the case of an unattested bond, that there may not be sufficient evidence by circumstances to prove the delivery and this brings us to another question referred to the court in this special case, which although it is not necessary to be considered in order to the determination of this case, which is an action of debt, and depends entirely upon the question, whether this be the deed of the party or not? yet, as it has been referred to the court, I suppose, for the purpose of having the law settled, upon this point also, I will make a few remarks on it.
The question is whether an action on the case lies upon such an instrument, when it cannot be proved as a deed?
As to this there is one rule certain: that no sealed instrument can be given in evidence to support an action on the case. Gilb. law of evid.100. Cro. Jac. 506, 598. The law has given a remedy of another sort upon those sealed instruments. An action on the case, depends upon parol evidence or writing only. Therefore the action on the case must necessarily be destroyed, when the evidence to support it is destroyed by extinguishment; and all parol contracts and agreements are held to be extinguihed when they become cloathed in a contract of greater solemnity, or evidenced by sealed instrument, as these sealed instruments are themselves extinguished, so that no action can be supported upon them, between the same parties, when they have passed in rem judicatam, and have become matter of record. All this depends upon the rule of law already mentioned, that the best evidence shall be required. Thus, a bond shall not be evidence, when there is a record of the same matter, nor parol evidence when there is a sealed instrument. This rule of law is not to be denied; and then the whole question is reduced to this; whether when a seal appears, the party, who produces the writing to which it is affixed, shall be permitted to say, it was not affixed to the writing originally? It has been for a long time a standing rule of law, framed first indeed for the protection of deeds, the only written instruments then in use, for unsealed instruments are but of modern date, 3 Term. 330, but in policy extending to every written contract, that the least alteration in any material part, shall render the whole writing totally void: and even an immaterial alteration, made by the holder of the instrument, shall make it void also. 11 Re. 27. A bill of exchange, payable three months from the 26th of November, was held to be totally void, it being found by the jury that the top of the figure 6 was blotted out, while in the possession of the holder of the as to make it appear to be the 20th instead of the 26th, and by that means to accelerate the payment; though in fact no such acceleration of payment had been attempted, 3. Term Rep. 320. Now, then to apply these rules to the case in hand, if the seal *16 was not affixed to the instrument at the time of its execution, and the addition of the seal afterwards be an immaterial alteration only then, the instrument being in the possession of the holder or obligee the presumption will be that it was added by him, and will turn it upon him to prove how it came there, like the case, where the seal was torn off by a child; this raised a presumption of the deed being cancelled, and turned it upon the plaintiff to shew how the seal came to be torn from the writing. Cro. El. 120. Palmer 403. Latch 226
In the case of the bill of exchange, lord Kenyon, speaking of the blot which made the alteration, said if it had been done by accident, that should have been found to excuse the party. He thought the alteration having been made, after the instrument came to the possession of the payee, raised so strong a presumption of his guilt, that, in point of law, the instrument should be deemed void, unless he could shew the blot happened without his privity: and so I am induced to think in the present case, that if the addition can be considered as an immaterial addition only, yet, to make men careful to preserve their written instruments free from all alteration or addition, it is good policy in the law, to suppose the alteration or addition made by the holder or obligee himself, therefore the moment he shews a sealed instrument and says the seal was not originally affixed to the writing, the whole instrument must be deemed void, unless he can show that the seal was affixed to it without any privity of his. But I take it the addition of a seal is not an immaterial alteration only. It avoids the act of limitations—it excludes the giving of parol testimiony to explain or control the writing—in any shape, it makes the party liable to another kind of action than that he at first stiputed-it deprives him of that latitude of evidence he might have had in the action on the case; and, before the act for the amendment of the law, would leave him, in the case of single bill as this is, no method of discharging himself but by a release, or acquittance under seal. In every point of view, therefore, the addition of the seal is a most material alteration; and if it be material, then, no matter how it happened, or by whom the alteration was made, the whole instrument is totally void; and no action whatever can be supported upon it; no more than if the seal had been torn off to make way for the proof of the writing, as a simple contract. The law requires that the contract shall remain unaltered—that the party may not be subjected in any other shape or manner than that which he has consented to. Besides, if when the signature of the party is proved that stands as presumptive evidence of his seal, then an unattended instrument being produced, and the handwriting of the party proved the presumption instantly arises and will stand for truth, until the party plaintiff shall overturn it by evidence, accounting for the affixing of the seal, and that it was done without the knowledge of the plaintiff, or any criminal intent in him: and for quacunque via data, the seal appearing, it must be accounted for, to by the least, by the plaintiff himself: and therefore i am of opinion, upon the last point referred in this special case, that debt is the proper action to be brought upon such an instrument, as is therein stated; and the action on the case can *17 in no infinite nor in any possible case, whatever be supported upon it: and this opinion receives credit from the argument of Justice Heath, in the case of Gibson and Johnson, vs. Minot and Foster, reported in H. Bl. Re. 622, where, arguendo, he lays it down as clear law, that, if the delivery of a bond cannot be proved, it cannot be concluded that it may be given in evidence as a note should: because the creditor having taken his security in a determined form, he cannot at his pleasure alter it, against the stipulation of the debtor; and yet, says he, the obligation includes a promise to pay the money,
Judge M’Coy was of opinion the instrument must be declared upon as a sealed instrument.
Judge Williams, was of opinion that the instrument could not be proved as a sealed instrument, for want of attestation; and therefore ought to be declared upon as a writing only.
Judge Ashe seemed to dissent from the opinion of Judge M’Coy but concluded that there should be
Judgment for the Plaintiff.*